IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
June 20, 2006 Session

## STATE OF TENNESSEE v. DAVID MICHAEL CHUBB

**Direct Appeal from the Criminal Court for Sumner County**
**No. 770-2002    Jane Wheatcraft, Judge**

**No. M2005-01214-CCA-R3-CD - Filed January 29, 2007**

The appellant, David Michael Chubb, was convicted by a jury in the Sumner County Criminal Court of four counts of aggravated sexual battery, one count of attempted aggravated sexual battery, one count of possession of marijuana, and one count of possession of drug paraphernalia.  The trial court sentenced the petitioner to a total effective sentence of fourteen years incarceration in the Tennessee Department of Correction.  On appeal, the appellant raises the following issues for our review: (1) whether the trial court erred in failing to inquire into the conflict of interest when it was revealed at trial that the appellant's trial counsel had previously represented the mother of the minor victim; (2) whether the trial court erred in allowing the State to admit a videotape into evidence; (3) whether the trial court erred in denying the appellant's motion for a bill of particulars; (4) whether the trial court erred in charging a special jury instruction requested by the State; (5) whether, according to the dictates of Blakely v. Washington, the trial court erred in sentencing the appellant; and (6) whether the trial court erred in imposing consecutive sentences.  Upon our review of the record and the parties' briefs, we reverse the convictions for aggravated sexual battery and attempted aggravated sexual battery based upon an improper instruction, affirm the drug related convictions, and remand for a new trial on the aggravated sexual battery and attempted aggravated sexual battery charges.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Reversed in Part; Affirmed in Part; Case Remanded.

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL, J., joined.  DAVID G. HAYES, J., filed a separate concurring opinion.

Patrick T. McNally, Nashville, Tennessee (on appeal), and Michael W. Edwards, Hendersonville, Tennessee (at trial), for the appellant, David Michael Chubb.

Paul G. Summers, Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; Lawrence Ray Whitley, District Attorney General; and Sally Wade Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I.  Factual Background

The appellant was originally charged with one count of rape of a child, five counts of aggravated sexual battery, one count of possession of marijuana, and one count of possession of drug paraphernalia.  A trial was held on these charges.

At trial, Paula East, the mother of the victim, R.E.,[1] testified that she had two children.  R.E. was born on June 8, 1988, and her brother, Shane, was born about a year later.  East recalled that she had gone to school with the appellant and had "remet" him some years later at the Eleventh Frame, the bar section of a bowling alley.  She and the appellant dated for a while before she and her children moved into his residence on Tyree Springs Road in Hendersonville in September 1992.  She testified that her sex life with the appellant was "fine at first," but it began to dwindle.  In May 1993, they moved into the Bluegrass Apartments.  In December 1995, they moved to the Lake d'Ville Apartments.  East stated that she and her children lived with the appellant for approximately nine years until her relationship with him ended in March 2001.  At that time, East and her children moved in with her parents.

On April 10, 2002, East and R.E. were watching the news on channel 5 and saw a broadcast "regarding a sex abuse case."  East stated that following the broadcast a list of questions was shown concerning possible signs that might indicate a child has been sexually abused.  East maintained that after she saw the broadcast, it "[j]ust popped in my head that this fit my daughter for some reason or another."  For example, East stated that R.E. experienced nightmares, could not sleep alone, clung to her, and displayed a lack of interest in school.  Following the broadcast, East and R.E. had a conversation in which R.E. disclosed that the appellant had sexually abused her.  The next morning, East reported the abuse to the Hendersonville Police Department.

East noted that she had previously suspected that the appellant might be abusing R.E.  East recalled that in late 1996 or early 1997, she took a painkiller before going to a neighbor's house.  When East returned home, she saw R.E. lying on top of the appellant, and R.E. was trying to get his hand out of her panties.  East told R.E. to follow her into the bathroom.  East asked R.E. what was going on, and R.E. replied, "[N]othing."  East asked R.E. if the appellant had touched her, and R.E. denied that any touching had occurred.  East said that she had been dizzy and "woozy" because of the medication and did not want to believe what she had seen.  Therefore, she convinced herself that she had been seeing things.

East stated that the appellant and R.E. were affectionate with each other.  She maintained that the only time she was troubled by the appellant's touching of R.E. was the occasion when she saw them on the couch after she had taken painkillers.  She did not confront the appellant about the incident.  She did not think there was a need to talk with the appellant because she believed R.E.

---

[1]  It is the policy of this court to refer to minor victims of sexual crimes by only their initials.

East stated that near the end of her relationship with the appellant, he was unemployed and would watch the children while East was working. In 1999 and 2000, R.E. and Shane were in different schools; therefore, R.E. and Shane arrived home at different times.

East stated that sometimes she and the appellant used babysitters to watch the children. Regardless, East said that the appellant would occasionally watch the children while she ran errands.

East averred that she had not suspected that the appellant was continually abusing R.E. She believed that the appellant was merely acting like a father to her children because their biological father was not around.

East recalled that the appellant kept a boat and a Sea-Doo at the Creekwood Marina. East saw the boat twice during her relationship with the appellant, but the appellant spent many hours working on the boat. East did not believe that her children had ever been on the appellant's boat.

East conceded that she and the appellant were having problems in their relationship when she witnessed the couch incident. East denied knowing Lisa Gibbner, and she did not recall ever telling Gibbner that "payback was going to be hell" for the appellant. However, East acknowledged that she could have made the statement. East acknowledged that she could have said in anger that she would make the appellant pay; however, she did not recall ever making that statement. She said that at the time the sexual abuse report was made, she was no longer angry with the appellant nor was she "out to get" him.

The victim, R.E., testified that she was fifteen years old at the time of trial and her younger brother, Shane, was fourteen. She recalled that she, her mother, and her brother moved into the appellant's Tyree Springs residence when she was three or four years old. When she was five or six years old, they lived in the Bluegrass Apartments. When R.E. was approximately six years old and was attending first grade, the appellant began to make her "uncomfortable." She explained, "He would just touch me in inappropriate areas, in my breast area or my vaginal area." R.E. recalled that if her mother was away or not in the room and her brother was outside playing, the appellant would start to rub her back because she liked back rubs. Then, he would progress to intimate touching. R.E. stated that the appellant touched her inappropriately every day or every other day. R.E. said that initially she did not realize that the touching was wrong; she explained, "When I was little, I thought he's an adult; he can do this."

When R.E. was six years old and living in Bluegrass apartments, she and the appellant were lying on the couch in the living room. Her mother and brother were not at home. R.E. testified, "The only thing I remember is he lifted me over his head and he licked me." R.E. stated that she was not wearing panties, but she could not remember how her panties had been removed. The appellant licked her vaginal area.

Later, the appellant, East, R.E., and Shane moved to Lake d'Ville Apartments. When she was seven or eight years old, R.E. and the appellant were on the couch. The appellant had put his hand down R.E.'s panties and was touching her vaginal area. R.E. was standing and had begun pulling up her underwear when East walked in. East took R.E. out of the room because she thought she had seen something inappropriate. East questioned R.E., but R.E. asserted that nothing had happened. R.E. testified that she lied to East "[b]ecause I thought he had the right to do it. I didn't think there was anything wrong with it at that time . . . . [H]e was an adult, and I was told that adults can do what they want."

R.E. recalled that when she got a little older, she began resisting the appellant. Specifically, she recalled an incident that occurred when she was eight or nine years old and was living at the Lake d'Ville apartment. R.E. stated that

> [t]here was this one time when we were on the couch, and he started rubbing me. Somehow or another I got up, and I ended up on the floor. I don't remember if I tripped or what happened, but he ended up getting on top of me, and I tried to push him off. When I couldn't get him off, I slapped at him, and finally I got away and I ran.

R.E. recalled that both she and the appellant were fully clothed at the time. During the incident, the appellant touched her breasts and vaginal area. R.E. said, "As soon as I got away, I went back to the hallway, and I waited there. Whenever I came back in, he was seated on the couch, and I went to a chair across the room."

R.E. recalled another incident that occurred when she was seven or eight years old and living at Lake d'Ville. R.E. was sleeping in the bedroom with East, and R.E. awoke to find the appellant rubbing her back. She said, "We laid there a little bit, watching TV. And after a bit, he took my hand and made me grab him . . . [o]n his private." R.E. had to hold the appellant's penis through his clothes for a while.

R.E. said that the appellant did not always talk during the incidents. She maintained, "He would just be really kind about it. Didn't say anything about what we were doing." However, if the appellant ever spoke during the abuse, his voice was "kind, soft" and not "harsh."

The week after July 4th, near the time that East, R.E., and Shane moved out of the appellant's residence, R.E. and the appellant went out on his Sea-Doo. They came to shore about sunset. The appellant's boat was docked, and R.E. and the appellant went onto the boat. R.E. said that they went down into a small sleeping compartment. The appellant turned on music, and they sat for a minute. R.E. was wearing a bathing suit consisting of shorts and a spaghetti strap shirt. The appellant touched R.E.'s breasts and later touched her vaginal area. R.E. was unable to leave because the appellant was positioned between her and the exit.

-4-

Some time after R.E., East, and Shane moved out of the appellant's residence, R.E. and East were watching the news. They saw a program about a man and pornography. At the end of the program, five questions were shown as indicators that a child had been sexually abused. East told R.E. that she had three or four of the indicators. At that time, R.E. told her mother about the appellant's abuse because she felt like it was the right time, and she felt like she needed to "get it out." R.E. said that the appellant was no longer around, and she felt safe and protected.

After R.E. told East of the abuse, R.E. met with Detective Jim Vaughn. At Detective Vaughn's request, R.E. telephoned the appellant. Prior to the call, Detective Vaughn and R.E. discussed "scenarios" to talk about during the calls. R.E. stated that she lied to the appellant during the conversations to try to get him to confess to the abuse. R.E. told the appellant that she missed him and that she had a boyfriend named Eric. Neither of those things were true.

R.E. stated that she would not have known if the appellant became aroused when he touched her. She said that she continued to feel the effects of the abuse. She explained that her friends could not approach her from behind and touch her shoulders because it would scare her or trigger flashbacks.

R.E. testified that the appellant was a father figure to her. She cared for him as a stepfather. She explained that she knew where certain incidents happened because she remembered "how everything was laid out. I remember that we had a small balcony. I remember small things." R.E. stated that the appellant and East did not have a happy relationship, and they had verbal arguments.

R.E. stated that she did not tell East about the abuse because she feared that East might not believe her or would get mad. After the incident in which she kicked the appellant, she wanted to tell East. However, she had previously lied to East about the abuse, and she thought that East would not believe her.

R.E. recalled that East was "pretty mad" when they moved out of the appellant's residence. The appellant had a girlfriend at the time. R.E. did not hear East say that she would get even with the appellant.

Detective Jim Vaughn with the Hendersonville Police Department testified that on April 11, 2002, after East reported R.E.'s sexual abuse, he became the lead investigator in the case. Detective Vaughn stated that delayed reporting was not unusual in a child sex abuse case because children try to forget the abuse as a coping mechanism. Detective Vaughn and Teresa Towery with the Department of Human Services interviewed R.E. at her school. After the interview, Detective Vaughn had R.E. telephone the appellant on April 16, 2002, in an attempt to gain incriminating information.

An audio recording of the April 16, 2002, conversation was played for the jury. The tape contained, in pertinent part, the following conversation:

R.E.: Um, I was watching the news the other day and it said something about child abuse, and my mom ended up saying that, you know, I had some of the signs of it. But, you know, um, remember how you used to touch me and stuff?

The appellant: Well, yeah.

R.E.: Um. Well. Was that kind of sexual?

The appellant: Well, no, I didn't think so. I mean, that was just, uh, [(pause)] you know [(pause)] just rubbing on you. I didn't think it was, I mean . . . .

. . . .

Did you?

R.E.: Yeah, because I mean it was in my private areas.

The appellant: Oh, well.

R.E.: I don't know. But, I mean [(pause)]. Why did you though?

The appellant: Well I didn't, I didn't think that, uh, I didn't think that it was, you know, [(pause)] that way.

. . . .

I thought you know, you were just , if it was, you know, if, I would believe that if it was like sexual that, you know, there it would have been, it would have been different. I don't know, but . . . .

. . . .

Damn, darling. I'm sorry you feel that way.

. . . .

R.E.: Yeah. Do you think I should tell my mom about you touching me and stuff?

The appellant:  Well, I [(pause)] [(sigh)] [(pause)].   I, you know, I don't think so, you [(pause)] it wouldn't, you know, it would probably save me a whole lot of trouble [(stammering)] if you know, if you feel bad about it, then . . . .

R.E.:  Trouble from what?

The appellant:  Well, you know, that [(pause)] can start some, I imagine that could start trouble for me.

R.E.:  What would happen to you?

. . . .

. . . I mean like, do you think my mom would go to the police or something?

The appellant:  Well, I'd hope not, but I, you know.  Never can tell.  She was always kind of, uh, [(pause)] nervous like that.  I mean, I don't know how she is now, is she getting any better?

. . . .

R.E.:  Yeah.  We just, I just want to know why, you know.  Why you really did that.

The appellant:  [(pause)] Well, uh, I, I don't know why.  I mean, I guess, [(pause)] you, you know we were laying there and uh, [(pause)].  It felt like, you know, it looked like to me that you wanted me to do that and [(pause)] until you told me to stop and then I always stopped, you know.

R.E.: Hmm.  Sometimes you didn't.  Sometimes you kept on.

The appellant:  [(pause)] Well, I, I [(stammers)], I don't, you know, I don't, I guess I don't really know how to explain it.  But you know, I – I – I hope that it's not bothering you.  Does it seem to . . . does it bother you?

R.E.:  [(sigh)]

The appellant:  I mean, apparently it does.  You called me up out of the blue to ask me about it.

R.E.: Well, yeah, it does kind of bother me. I mean it made me kind of – it made me feel like I had done something, you know.

. . . .

And I just really need to talk to somebody. I don't know who to – who to talk to.

. . . .

I can't go to my mom because she'd probably flip.

The appellant: Yeah.

. . . .

Well, would you like to talk to me about it? I mean . . . .

. . . .

Well, hopefully we can talk – we can talk the way through this, I, you know, like I said didn't think that it would be – I didn't really look at it as that way.

R.E.: I mean, I thought about talking to, just like a secret help-line, police line or something, and – I didn't know.

. . . .

That would help.

The appellant: [(sigh)][(pause)] Well, that could help, I don't know. [(stammering)] Like I say, I'd hope that, uh, between the two of us we could take, we could, uh, talk it out or whatever or maybe you, you know, maybe you do need to find . . . .

. . . .

Someone else to help us. But, I didn't – I – like I say – I – didn't think of it as, as, as sexual, as that way.

. . . .

R.E.: I mean in a way it kind of was.

The appellant: Well, I [(pause)]. I – like I say I – I just never thought of it that way, and I'm – I – I guess – I – you know I don't want to say that you got the wrong idea about it, but . . . .

. . . .

R.E.: It started when I was a little girl.

The appellant: Well, that's what I thought – I – you know – I thought that was just – that– something that you want – something – that, uh – you like for me to do and – I – like I said when, when I did, when you, you told me to stop I did. I didn't have any, you know . . . .

R.E.: Yeah, well, I mean, there's just some times where I remember one time, you took me out of my room and stuff, and I was just kind, I got kind of . . . you know – I've been kind of nervous, like am I a virgin? You never really done anything to me have you?

The appellant: Well, certainly, no. I have never. No.

. . . .

. . . It wasn't anything like that sweetheart, that's why I say, I never thought of it as being like that. That's why I never thought of it being like, that way.

. . . .

I mean, it was just sort of, you know, uh, rubbing your back, rubbing your shoulders, rubbing you – rubbing your tummy, you know, rubbing your legs.

R.E.: Well, in the inner parts of my legs, and between my legs. It was all over.

The appellant: Like I said, when –at that point when – when you told me to stop then, then I did.

. . . .

No, it's nothing like that I . . . . Boy, no wonder it's bothering you like that. I'm – I'm sorry to hear that sweetheart. I really am.

. . . .

R.E.: Okay. But, you don't think I should tell my mom?

The appellant: Well, I think your mom would probably pretty much freak out if you told her something like that, like you said. I don't, uh, like I say I'm – I'm – I'm sorry that you thought it was that way I – I – and – I – maybe– you know, unless it's really bothering you, may be more trouble than it's worth. Hopefully you and I can talk our way through this or – or maybe we – you and I can go get somebody to help us or whenever.

Detective Vaughn had R.E. place another call to the appellant on April 23, 2002. During this conversation, R.E. told the appellant that she had a boyfriend named Eric who had "been wanting to like touch me like you were and stuff. . . . Do you think I should let him?" The appellant responded, "Well, probably not, darlin'. . . . I'm sure that he's after something." R.E. told the appellant that East had asked R.E. about seeing her and the appellant on the couch once in a suspicious situation. The appellant said, "Really, I don't remember that. . . . You got a little bit better memory than I do."

On September 12, 2002, Detective Vaughn and Detective Bob Fohrd went to the appellant's residence at Waterview Apartments to confront the appellant about the abuse of R.E. Detective Vaughn knocked on the door, and the appellant answered. Detective Vaughn asked the appellant if the detectives could come in to the apartment. The appellant stated that he needed to straighten up the apartment, and Detective Vaughn told the appellant that it was not necessary. The appellant then acceded to the detectives' request to enter.

As they were walking through the living room, Detective Vaughn saw two "one-hitters," wooden boxes which typically contain enough marijuana for a single use and an accompanying smoking apparatus. Detective Vaughn asked the appellant if anyone else was in the apartment. The appellant told him that his girlfriend, Audrey Wiater, was asleep upstairs.

The men proceeded to the kitchen, and Detective Vaughn told the appellant that he wanted to talk about the situation with R.E. The appellant said that he had told R.E. that she could discuss her problems with East or the police. Detective Vaughn informed the appellant that R.E.'s calls had been recorded, and he was aware of what the appellant had said to R.E. Detective Vaughn said that he did not believe the appellant was truthful during the interview.

The appellant told the detectives that he had invited them in and could uninvite them. Detective Vaughn informed the appellant that the detectives could not leave because they had seen

the "one-hitters" in the apartment. Detective Vaughn had several officers come to the apartment to watch the appellant while he went to apply for a search warrant. After obtaining the search warrant, Detective Vaughn returned to the appellant's apartment. The search of the apartment revealed two "one-hitters," marijuana seeds, a funnel, cigars, rolling papers, a marijuana pipe, and at least two bags containing a total of 5.3 grams of marijuana.

Keith Lovell, the chief videotape editor with WTVF in Nashville, testified at trial that on April 10, 2002, the station broadcast the program "Operation Candy Man." He stated that although the main portion of the broadcast was kept, the information immediately following the program was not kept. The main portion of the broadcast was then played for the jury.

The appellant testified on his own behalf. He stated that in 1991, he and East met at the Eleventh Frame nightclub in Hendersonville. Thereafter, they began living together with East's two children in a house he was renting on Tyree Springs Road in Hendersonville. When he and East first began living together, he spent six months working at Malone and Hyde. His hours were from 5:30 a.m. to 3:30 p.m., and he also worked as an auto mechanic on the side. The appellant said that at that time, he came home most evenings, and East was usually home with the children when he arrived.

The appellant then began working for Tom Bannen Chevrolet ("Tom Bannen"), and he stayed there for six years. His working hours were 7:30 a.m. to 6:30 or 7:00 p.m., and he worked quite a bit of overtime but no weekends. He stated that he was alone with the children occasionally when East ran errands. In 1999, the appellant left Tom Bannen and opened Chubb's Automotive. He worked from 7:30 a.m. to 7:30 p.m. and occasionally worked weekends. He said that at that time he was "very rarely" alone with the children. The appellant closed Chubb's Automotive in 2001 and went through a period of unemployment from the end of 2001 to the beginning of 2002. The appellant recalled that during a period of unemployment, R.E. arrived home from school an hour or two before Shane, and the appellant was at home when R.E. arrived.

The appellant testified that East left him on two occasions, the first being for three months in 1997. Thereafter, East returned to try to resolve their problems. The appellant said, "We fought quite a bit and [there was] not much love left in the relationship." He stated that they had verbal altercations over Lisa Gibbner, another woman in the appellant's life. The appellant began an affair with Gibbner when they both worked at Tom Bannen. In 1996, East called Tom Bannen and tried to get Gibbner and the appellant fired. The appellant learned from Gibbner that East called her at work and told her, "Payback is a bitch. I'll get you both."

After the appellant and East separated the second time, he did not hear from her again. Then, on April 16, 2002, he received a call from R.E. He said that he was "quite surprised" to hear from her. When East and the appellant were together, he formed a "pretty good . . . father-daughter-type relationship" with R.E. He said that he loved her "as a child, you know as my daughter, as a stepdaughter." During the call, when R.E. mentioned the appellant touching her, he thought she was talking about the times he rubbed her back as they were watching television. The appellant said that he was careful in how he responded to R.E.'s conversation. He did not want to call her a liar or say

that she was crazy because he was trying to be careful of R.E.'s feelings. He explained, "I wanted to try to smooth out the situation versus trying to aggravate it." The appellant stated that he sometimes rubbed R.E.'s back, but "[w]hen she would get up and tell me to stop, I would stop. You know, I never – I didn't rub in her private areas."

At trial, the appellant denied that he ever touched R.E. in a sexual manner. He said that he and R.E. would "[p]lay, wrestle, things like that." He never gave R.E. a bath or saw her naked because "[h]er mother was kind of protective of that."

The appellant stated that R.E. has never been on his boat. He explained that during his relationship with East he did not want East to find out about the boat; therefore, he hid it from her so she would not complain about it. The appellant admitted that R.E. had ridden on the Sea-Doo. In the summer of 1998 or 1999, he and R.E. went alone to ride the Sea-Doo. The appellant's boat was at the same dock as the Sea-Doo, but they never went on the boat.

The appellant said that on several nights during the relationship with East he did not come home. He did not recall ever being alone with the children when they lived at Bluegrass Apartments; however, he was occasionally alone with the children when they lived at Lake d'Ville Apartments.

The appellant said that R.E. had no reason to accuse him of these crimes. He never threatened R.E. or told her that it was okay for an adult to touch a child.

The appellant stated that when the detectives arrived at his apartment, he tried unsuccessfully to delay their entrance. After they were there for a while, the appellant asked the detectives to leave. They said that they could not go because they had seen marijuana paraphernalia in the apartment. The appellant admitted that the marijuana found in the apartment belonged to him.

Lisa Gibbner testified that when she worked at Tom Bannen, she began a romantic relationship with the appellant. The relationship lasted until 1999. Almost every night the appellant came to her apartment after work. He either spent the night or left at 2:00 or 3:00 a.m. Gibbner knew the appellant was living with East, but she never met East. In summer 1995, East found out about the appellant's relationship with Gibbner. East called Gibbner and said, "Bitch, I will get you. [The appellant] will pay. Maybe not today, but he will pay." Gibbner took the statement as a threat, and she said that the statement bothered her.

Gibbner said that she trusted the appellant, and he was her best friend. She trusted him with her children, saying "If I were to die today, I would leave my children to him." Gibbner stated that she never saw the appellant exhibit any bizarre behavior.

Audrey Wiater, the appellant's girlfriend, stated that she was staying with the appellant at the time he was arrested. Her daughter had been around the appellant a few times. The appellant had never exhibited any bizarre behavior. Wiater said that the appellant was honest and truthful.

Based upon the foregoing evidence, the jury convicted the appellant of four counts of aggravated sexual battery, one count of attempted aggravated sexual battery, one count of possession of marijuana, and one count of possession of drug paraphernalia. The trial court sentenced the petitioner to ten years for each aggravated sexual battery conviction; four years for the attempted aggravated sexual battery conviction; and eleven months and twenty-nine days for each of his convictions for the possession of marijuana and possession of drug paraphernalia. The trial court ordered the aggravated sexual battery sentences, the marijuana sentence, and the paraphernalia sentence to be served concurrently with each other. The court further ordered that the attempted aggravated sexual battery sentence be served consecutively to the aggravated sexual battery sentences for a total effective sentence of fourteen years.

On appeal, the appellant raises the following issues for our review: (1) whether the trial court erred in failing to inquire into the conflict of interest when it was revealed at trial that the appellant's trial counsel had previously represented the mother of the minor victim; (2) whether the trial court erred in allowing the State to admit a videotape of a news broadcast into evidence; (3) whether the trial court erred in denying the appellant's motion for a bill of particulars; (4) whether the trial court erred in charging a special jury instruction requested by the State; (5) whether, according to the dictates of Blakely v. Washington, the trial court erred in sentencing the appellant; and (6) whether the trial court erred in imposing consecutive sentences. We will address these issues in a different order than that in which they were raised.

## II. Analysis

### A. Bill of Particulars

First, we will address the appellant's complaint that the trial court erred in denying his motion for a bill of particulars. The State contends that the appellant waived this issue by failing to include a transcript of the hearing on the motion, or, in the alternative, that the trial court properly denied a bill of particulars based upon the State's open file discovery policy.

The record reflects that on count one the appellant was charged with "on or about the latter part of 1994 . . . unlawfully, knowingly and feloniously sexually penetrat[ing] [R.E.], a child less than thirteen years of age, by performing cunnilingus on the victim." On count two, the appellant was charged with "on or about 1996 . . . knowingly and feloniously hav[ing] unlawful sexual contact with [R.E.], a child less than thirteen years of age by intentionally touching the victim's vaginal area." On count three, the appellant was charged with "on or about 1997 . . . knowingly and feloniously attempt[ing] to sexually penetrate [R.E.], a child less than thirteen years of age by attempting to have sexual intercourse with the victim." On count four, the appellant was charged with "on or about 1997 or 1998 . . . knowingly and feloniously hav[ing] unlawful sexual contact with [R.E.], a child less than thirteen years of age by intentionally forcing R.E. to touch [the appellant's] penis over his clothing." On count five, the appellant was charged with "between on or about the Summer of 2000 and March 2001 . . . knowingly and feloniously hav[ing] unlawful sexual contact with [R.E.], a child less than thirteen years of age by intentionally touching R.E.'s breasts." On

count six, the appellant was charged with "between on or about the Summer of 2000 and March 2001 . . . knowingly and feloniously hav[ing] unlawful sexual contact with [R.E.], a child less than thirteen years of age by intentionally touching R.E.'s vaginal area." Count seven charged the appellant with possession of marijuana, and on count eight the appellant was charged with possessing drug paraphernalia.

On August 22, 2003, the appellant filed a motion for a bill of particulars, asking that the State be required to reveal "[t]he exact times and dates of the offenses so that the defendant may know when the offenses occurred," "[t]he exact location of the offense," "[t]he nature of the injuries sustained by R.E. of the alleged rape," and "[t]he manner and nature of any package containing the drugs." On September 5, 2003, the trial court entered an order addressing the appellant's motion. The order states:

> The State stated that all discovery that was in . . . their possession had been provided and that there were audio tapes and a video tape that was in the possession of Detective Jim Vaughn of the Hendersonville Police Department.
>
> IT IS THEREFORE, ORDERED that Detective Jim Vaughn of the Hendersonville Police Department provide the audio tapes to the Defense by Monday, September 1, 2003 and the video tape be made available to the Defense for reviewing on the same date.

Initially, we will address the State's claim that the appellant has waived this issue. Generally, an appellant carries the burden of ensuring that the record on appeal conveys a fair, accurate, and complete account of what has transpired with respect to those issues that are the basis of appeal. Tenn. R. App. P. 24(b); see also Thompson v. State, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997). "In the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence." State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). In the instant case, it appears that the State is correct in maintaining that there was a proceeding relating to the motion for a bill of particulars and that a transcript of the proceeding was not placed in the appellate record for our review. Regardless, we conclude that the merits of the appellant's claim can be addressed based upon the record before us.

Tennessee Rule of Criminal Procedure 7(c) provides that, "[o]n defendant's motion, the court may direct the district attorney general to file a bill of particulars so as to adequately identify the offense charged." The decision whether to order a bill of particulars lies in the discretion of the trial court, and this court will not reverse the trial court's denial of a bill of particulars absent a showing that the trial court abused its discretion. See State v. Stephenson, 878 S.W.2d 530, 539 (Tenn. 1994).

There are three purposes of a bill of particulars: (1) to provide the defendant with information about the details of the charge if this is necessary to the preparation of the defense; (2) to avoid

-14-

prejudicial surprise at trial; and (3) to enable the defendant to preserve a claim of double jeopardy. State v. Byrd, 820 S.W.2d 739, 741 (Tenn. 1991). The Advisory Commission Comments to Rule 7(c) state that the purpose of the bill of particulars is to enable the defendant to know "precisely what he or she is charged with." It is not meant to be used for the purposes of broad discovery. See Tenn. R. Crim. P. 7(c), Advisory Commission Comments; see also Stephenson, 878 S.W.2d at 539.

"'The test in passing on a motion for a bill of particulars should be whether it is necessary that [the] defendant have the particulars sought in order to prepare his defense and in order that prejudicial surprise will be avoided.'" State v. Hicks, 666 S.W.2d 54, 56 (Tenn. 1984) (quoting 1 C. Wright, Federal Practice and Procedure, Criminal, § 129 (1982)). If the needed information is in the indictment or has been provided by the State in some other satisfactory form, no bill of particulars is required. Id. A bill of particulars is not intended to be a means of learning the State's evidence and theories, although to the extent the information sought is necessary, it will be required, even if to do so discloses the State's evidence or theories. Id.

On appeal, the appellant asserts that he was denied his right to a fair trial because the trial court refused to grant his motion for a bill of particulars. However, the appellant has not argued how any information from a bill of particulars would have changed his trial preparation or defense. The appellant has not alleged any specific information that was withheld by the State. The appellant also has not said how his defense was hampered by any such withheld information. In other words, the appellant has not stated how he was prejudiced by the lack of a bill of particulars. See State v. Thomas Wayne Overbay, No. E1999-00840-CCA-R3-CD, 2000 WL 1246617, at *6 (Tenn. Crim. App. at Knoxville, Sept. 5, 2000), State v. Michael Thomason, No. W1999-02000-CCA-R3-CD, 2000 WL 298695, at *8 (Tenn. Crim. App. at Jackson, Mar. 7, 2000). Specifically, we note that in the order responding to the motion for the bill of particulars, the trial court observed that the State engaged in open file discovery, enabling the appellant to discover the information known to the State. Further, when discussing election of offenses at trial, the appellant's counsel stated, "I know on the bill of particulars that [the State] gave me everything that she had." We conclude that the appellant is not entitled to relief on this issue.

B. Admission of Video

The appellant argues that the trial court erred when it allowed the State to introduce into evidence a videotape of the news broadcast "Operation Candy Man," which broadcast prompted R.E. to disclose the sexual abuse to East. The appellant contends that the videotape was not relevant to any fact of consequence at trial.

As the State notes in its brief, at trial the appellant objected to the admission of the videotape, arguing that the tape was inadmissible hearsay. The appellant contended that

> [t]here were five instances that the tape stated that Ms. East had
> indicated [R.E.] was exhibiting. That would go to the truthfulness or

to whether or not this newscast is saying these are signs of child abuse, and I think it would unduly prejudice my client.

On appeal, however, the appellant argues that the videotape should not have been admitted because it was not relevant to any issue of consequence at trial. "As a general rule, a party may not litigate an issue on one ground, abandon that ground post-trial, and assert a new basis or ground on appeal." State v. Leach, 148 S.W.3d 42, 55 (Tenn. 2004); see also Tenn. R. App. P. 3(e), 36(a). Initially, we note that the trial court did not abuse its discretion in determining that the videotape was not being offered for the truth of the matter asserted; instead, the State was offering the tape as proof of the "trigger" for R.E.'s disclosure of the sexual abuse. Because it was not raised at trial, we will not now address the relevancy of the videotape.

## C. Conflict of Interest

The appellant's next issue concerns whether "[t]he trial court's failure to inquire into trial counsel's conflict of interest between successive representation deprived [the appellant] of the right to retain conflict-free counsel as guaranteed by Article I, Section 9 of the Tennessee Constitution and the Sixth and Fourteenth Amendments to the United States Constitution."[2] The appellant's complaint arose when, at trial, his counsel began to cross-examine Paula East, the mother of R.E. The following colloquy then occurred:

> [Counsel:] Ms. East, I have to ask you this: Have I ever been your lawyer?
>
> [East:] Yes, you have.
>
> [Counsel:] I thought I had. I just didn't remember. Do you remember what it was about?
>
> [East:] A divorce.
>
> [Counsel:] And it was in what year?
>
> [East:] 1991.
>
> [Counsel:] And you had these babies at that time?
>
> [East:] Yes.
>
> [Counsel:] I'm sorry, I didn't remember your name. But it is still the same isn't it?

---

[2] We note that the appellant did not raise this issue in the context of ineffective assistance of counsel.

[East:]  Still the same.

[Counsel:]  I just can't remember anymore.

Later, a similar exchange took place during counsel's cross-examination of R.E.:

[Counsel:]  Hello . . . .  I've never met you.  I represent [the appellant].  You probably don't know it, but I got your mother's divorce.

[R.E.:]  Yes, I know.

[Counsel:]  Why didn't somebody tell me?  I didn't remember.  Did she just tell you?

[R.E.:]  No. I knew about it whenever we found out that you were the attorney.

[Counsel:]  You were only one, I believe, weren't you?

[R.E.:]  Yes.

Neither the appellant or his defense counsel raised an objection based upon conflict of interest to counsel's continuing representation of the appellant.  At the motion for new trial proceeding, the appellant was represented by a new attorney.  In the motion for new trial, the appellant argued that the trial court had a duty to inquire as to the nature of the conflict once it was disclosed during trial.

At the hearing on the motion, the appellant called his trial counsel to testify.  Counsel stated that he had been licensed to practice since 1975.  He began representing the appellant in late 2002 or early 2003, and a trial was held in September 2003.  Counsel stated that on the first day of trial as he was coming into the courthouse, he saw R.E. and East.  Counsel thought that East looked familiar.  He said that he may have even asked the appellant who East was.  He asserted that he did not recall that he had previously represented R.E.'s mother in a divorce case until East confirmed it on cross-examination.  Counsel acknowledged that he did not have a conflicts system in his office.

Counsel stated that after the disclosure he did not discuss the matter with the appellant "because I didn't feel a conflict existed at that time because I remembered not one thing about Paula East." He also stated, "I don't remember anything about that case.  Period."  Counsel asserted that after he learned of the prior representation, his representation of the appellant was not clouded in any way.

-17-

The appellant testified that he met East after her divorce was final, and he did not know that counsel had represented East in a divorce proceeding. The appellant said that when East approached the witness stand, counsel asked the appellant if he had ever represented her. The appellant said that he responded by "shrugg[ing] my shoulders kind of in disbelief." Counsel never discussed a possible conflict of interest with the appellant. The appellant stated, "I believe that the fact that he may have represented her and her daughter at one point in his career possibly threw him off when he was cross-examining her. Like, as stated in the record, I guess, earlier, that he seemed to be shaken when he saw her and then asked me about – if he knew her." The appellant said that he had reflected upon the potential conflict and would have sought other counsel had he known of the conflict.

In its order denying the motion for new trial, the trial court found that "[w]hile it is unfortunate that [counsel] was not aware of the potential conflict prior to trial, the Court did not find it necessary to stop the trial. The representation was many years before and the Court is satisfied that counsel's performance was not in any way affected by his prior representation."

On appeal, the appellant complains that the trial court knew or should have known counsel had a conflict in the instant case and should have inquired about the conflict. The appellant contends that the trial court's failure to make the inquiry is an error of constitutional dimensions requiring automatic reversal.

Initially, we note that it is unquestioned that "an accused is entitled to zealous representation by an attorney unfettered by a conflicting interest." State v. Thompson, 768 S.W.2d 239, 245 (Tenn. 1989). However, "[i]n order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, 446 U.S. 335, 348, 100 S. Ct. 1708, 1718 (1980). This court has noted that "[a]n actual conflict of interest is usually defined in the context of one attorney representing two or more parties with divergent interests." State v. Tate, 925 S.W.2d 548, 552 (Tenn. Crim. App. 1995); see also Clinard v. Blackwood, 46 S.W.3d 177 (Tenn. 2001). In other words, an actual conflict of interests exists when counsel is placed in a position of divided loyalties. McCullough v. State, 144 S.W.3d 382, 385 (Tenn. Crim. App. 2003).

There are several potential types of conflict of interest. For example, there is the potential for a conflict of interest during instances of multiple representation; i.e., when one attorney simultaneously represents clients with differing interests. See State v. White, 114 S.W.3d 469, 476 (Tenn. 2003). Additionally, a conflict of interest can arise from successive representation, namely when an attorney who once represented a co-defendant or witness currently represents the accused.[3]

---

[3]  "Effective March 1, 2003, the Code of Professional Responsibility was replaced by the Tennessee Rules of Professional Conduct, likewise codified at Tennessee Supreme Court Rule 8." State v. McCullough, 144 S.W.3d 382, 385 n.1 (Tenn. Crim. App. 2003). New Rule 1.9(a) of the Rules of Professional Conduct provides:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that

(continued...)

See State v. Coulter, 67 S.W.3d 3, 29 (Tenn. Crim. App. 2001); see also United States v. Shepard, 675 F.2d 977, 979 (8th Cir. 1982). Demonstrating an actual conflict of interest is generally more difficult in a successive representation case than in a simultaneous representation case. See Enoch v. Gramley, 70 F.3d 1490, 1496 (7th Cir. 1995); Smith v. White, 815 F.2d 1401, 1405 (11th Cir. 1987).

One of the chief concerns in successive representation cases "is the possibility that the attorney may use or divulge on behalf of the new client confidential or privileged information obtained from the former client." Coulter, 67 S.W.3d at 29. Successive representation may result in an actual conflict "'if the cases are substantially related or if the attorney reveals privileged communications of the former client or otherwise divides his loyalties.' A corollary danger is that the lawyer will fail to cross-examine the former client rigorously for fear of revealing or misusing privileged information." Enoch, 70 F.3d at 1496 (quoting Mannhalt v. Reed, 847 F.2d 576, 580 (9th Cir. 1988)). Actual prejudice can be found if "(1) counsel's earlier representation of the witness was substantially and particularly related to counsel's later representation of defendant, or (2) counsel actually learned particular confidential information during the prior representation of the witness that was relevant to defendant's later case." Smith, 815 F.2d at 1405. In the instant case, there is no evidence in the record that an actual conflict existed because of counsel's prior representation of East.

Regarding the issue of the court's duty to inquire into potential conflicts, we note that Rule 44(c) of the Tennessee Rules of Criminal Procedure mandates that a trial court inquire as to potential conflicts of interest when an attorney appears in court representing co-defendants. Our rules do not explicitly address other instances in which a trial court has a duty to inquire into conflicts of interest. Although the instant case does not concern an issue of multiple representation, we find guidance as to the trial court's duty to inquire in Cuyler v. Sullivan. In Sullivan, the United States Supreme Court explained that "nothing in our precedents suggests that the Sixth Amendment requires state courts themselves to initiate inquiries into the propriety of multiple representation in every case." 446 U.S. at 346, 100 S. Ct. at 1717. In fact, "[u]nless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry." Id. at 347, 100 S. Ct. 1717.

From the record before us, it appears that while neither the appellant nor the appellant's counsel objected to counsel's continued representation on conflict grounds, the court was nonetheless made aware of a possible conflict of interest.

---

[3](...continued)
> person's interests are materially adverse to the interests of the former client, unless the former client consents in writing after consultation.

Tenn. Sup. Ct. R. 8, RPC 1.9(a).

[B]ringing a conflict home to a court does not . . . oblige a trial judge to conduct an inquiry anytime the judge becomes aware of a potential conflict of interest. The Supreme Court never intended to require a trial court to initiate an inquiry every time it becomes aware of a possible conflict of interest.

Beets v. Collins, 986 F.2d 1478, 1484 (5th Cir. 1993) (citing Sullivan, 446 U.S. at 346-47, 100 S. Ct. at 1717). While the better practice in this case would have been for the trial court to make further inquiry into the possible conflict caused by counsel's prior representation of a State witness, we can not conclude that the trial court violated a duty to inquire further. It was apparent by the questions asked by counsel that he had little recollection of his representation of East, and he felt no particular bias in favor of East. Moreover, we note that counsel adequately cross-examined both East and R.E. The appellant is not entitled to relief on this issue.

We also note that, as Sullivan suggests, "[d]efense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial." 446 U.S. at 346, 100 S. Ct. at 1717. In the instant case, even in the face of a potential conflict, counsel did not ask the court for a recess or a jury-out hearing in order to determine the extent of the conflict. Clearly, the preferable course of action would have entailed not bringing counsel's previous representation to the jury's attention. However, we cannot conclude that this is error meriting reversal.

D. Jury Instruction

The appellant's next issue relates to a special instruction given by the trial court at the State's request. Specifically, the appellant contends that the instruction given by the court lessened the State's burden of proof. Further, the appellant claims that the instruction "bolstered [R.E.'s] credibility to the jury and diminished the value of [the appellant's] testimonial denials."

Prior to the jury charge, the State submitted in writing a request for a special jury instruction. The proposed jury instruction stated, "The Court instructs you that in a sexual abuse case you may convict the defendant on the basis of the victim's testimony alone. Corroboration of the victim's testimony is not necessary." Despite the appellant's objection, the trial court agreed to give the special instruction, finding that it was a correct statement of the law. On appeal, the appellant argues that the trial court erred by giving the instruction because the "special corroboration instruction 'corroborated' [R.E.'s] allegations."

A defendant has a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Therefore, trial courts "should give a requested instruction if it is supported by the evidence, embodies a party's theory, and is a correct statement of the law." State v. Phipps, 883 S.W.2d 138, 150 n. 20 (Tenn. Crim. App.1994). Moreover, we have previously noted that "[w]e must review the entire [jury] charge and only invalidate it if, when

-20-

read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995).

Generally, "a defendant cannot be convicted upon the uncorroborated testimony of [an] accomplice[]." State v. McKnight, 900 S.W.2d 36, 47 (Tenn. Crim. App. 1994). "An accomplice is defined as a person who knowingly, voluntarily, and with common intent with the principal offers to unite in the commission of a crime." Id. This court has observed that "[a] child can be an accomplice in a sex-related case. When a child is deemed an accomplice, the testimony of the child, like an adult, must be corroborated." State v. Griffis, 964 S.W.2d 577, 588 (Tenn. Crim. App. 1997) (footnote omitted). However, such is not the case when the child victim is less than thirteen years old. Tennessee Code Annotated section 40-17-121 (2003) provides:

> If the alleged victim of a sexual penetration or sexual contact within the meaning of § 39-13-501 is less than thirteen (13) years of age, such victim shall, regardless of consent, not be considered to be an accomplice to such sexual penetration or sexual contact, and no corroboration of such alleged victim's testimony shall be required to secure a conviction if corroboration is necessary solely because the alleged victim consented.

See also State v. Ballinger, 93 S.W.3d 881, 887 (Tenn. Crim. App. 2001).

We agree with the appellant that the instruction should not have been given. In the context of addressing whether the evidence is sufficient to support the conviction, the testimony of the victim alone could be sufficient. However, the use of the disputed language in the context of instructing the jury regarding the State's burden of proof runs a serious risk of misleading the jury. Moreover, in Tennessee judges are prohibited from commenting on the credibility of witnesses or on the sufficiency of the evidence. Tenn. Const. Art. VI, § 9; State v. Suttles, 767 S.W.2d 403, 406-07 (Tenn. 1989). The proof in this case essentially presented to the jury a question of credibility between the victim and the appellant. The jury instruction effectively informed the jury that they need look no further than the victim's testimony to convict and thus implied that the jury need not consider all other proof. Accordingly, we conclude that the error merits reversal of the appellant's aggravated sexual battery and attempted aggravated sexual battery convictions. However, we conclude that the instruction had no impact on the appellant's drug related convictions.

### E. Sentencing

The appellant's final issues concern the sentences imposed by the trial court. Although we have reversed the appellant's convictions for aggravated sexual battery and attempted aggravated sexual battery, we will address his sentencing issues as to those convictions to facilitate further appellate review. At the outset, we note that appellate review of the length, range or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d) (2003). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial

and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statement by the appellant in his own behalf; and (7) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210 (2003); see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence(s). See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

### 1. Blakely

As his first sentencing issue, the appellant contends that the trial court erred in applying certain enhancement factors that were not admitted by the appellant or found by a jury in violation of Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004). In Blakely, the Supreme Court explained that the "'statutory maximum' for Apprendi[v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000)] purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" Blakely, 542 at 303, 124 S. Ct. at 2537. However, recently in State v. Gomez,163 S.W.3d 632, 661 (Tenn. 2005), a majority of our supreme court found that, unlike the sentencing scheme discussed in Blakely, "Tennessee's sentencing structure does not violate the Sixth Amendment." Therefore, we are compelled to conclude that the trial court did not err in failing to submit the enhancement factors to the jury for their determination. The appellant is not entitled to relief on this basis.

In our de novo review, we note that the trial court found the existence of two enhancement factors: (8) the offense involved a victim and was committed to gratify the appellant's desire for pleasure or excitement, and (16) the appellant abused a position of public or private trust, or used a special skill in a manner that significantly facilitated the commission or the fulfillment of the offense. The record amply supports the application of enhancement factor (16), particularly in light of the testimony of both the appellant and R.E. that at the time of the offenses the appellant was a "father figure" to R.E. See State v. Kissinger, 922 S.W.2d 482, 489 (Tenn. 1996). However, the record does not support the application of enhancement factor (8). Aggravated sexual battery requires that the defendant have "unlawful sexual contact with a victim." Tenn. Code Ann. § 39-13-504(a) (2003). Sexual contact is defined as an intentional touching of a victim's intimate parts or the clothing covering R.E.'s intimate parts, "if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501 (6) (2003). Therefore, enhancement factor (8) may not be applied to a conviction for aggravated sexual battery or attempted aggravated sexual battery because it is also a necessary element of the offense. State v. Hayes, 899 S.W.2d 175, 185 (Tenn. Crim. App. 1995).

The trial court also found the existence of mitigating factors, namely that the appellant "does not have a seriously long criminal history" and that the appellant "has good family relationships."

See Tenn. Code Ann. § 40-35-113(13) (2003). Considering the enhancement and mitigating factors, the trial court sentenced the petitioner to ten years for each aggravated sexual battery conviction; four years for the attempted aggravated sexual battery conviction; and eleven months and twenty-nine days for each of his convictions for the possession of marijuana and possession of drug paraphernalia. Regardless of the error in finding enhancement factor (8) applicable to the appellant, we conclude that the length of the sentence imposed by the trial court was supported by the record. See State v. John Ramsey Duncan, No. M2005-01431-CCA-RM-CD, 2005 WL 1768754, at *15 (Tenn. Crim. App. at Nashville, July 27, 2005), perm. to appeal denied, (Tenn. 2005).

## 2. Consecutive Sentencing

The appellant's final issue concerns the imposition of consecutive sentencing. At the conclusion of the sentencing hearing, the trial court found that consecutive sentencing was proper because the appellant was "convicted of two or more statutory offenses involving sexual abuse of a minor, with consideration of the aggravating circumstances arising from the relationship between the defendant and the victim and the time span." Therefore, the trial court ordered the appellant to serve his four-year sentence for attempted aggravated sexual battery consecutively to his ten-year sentences for aggravated sexual battery, for an effective fourteen-year sentence. On appeal, the appellant contends that the trial court erred in imposing consecutive sentences.

Initially, we note that "[w]hether sentences are to be served concurrently or consecutively is a matter addressed to the sound discretion of the trial court." State v. Adams, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997). Tennessee Code Annotated section 40-35-115(b) (2003) contains the discretionary criteria for imposing consecutive sentencing. See also State v. Wilkerson, 905 S.W.2d 933, 936 (Tenn. 1995). The trial court may impose consecutive sentencing upon finding the existence of any one of the following criteria:

> (1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to R.E. or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b)(1)-(7) (2003).

The appellant contends that "[w]ithout minimizing the nature of the offense, this case involved only 'fondling,' at worst, and there was nothing especially horrifying, shocking or outrageous in the nature of these offenses such that consecutive sentences would be warranted." He also contends that the trial court's utilization of the relationship between the appellant and R.E. to both enhance his sentence and impose consecutive sentencing "amounts to impermissible double counting."

In the instant case, the appellant was convicted of multiple counts of the aggravated sexual battery and attempted aggravated sexual battery of a child. At the time of the offenses, the appellant was involved with R.E.'s mother, and he served as a "father figure" to R.E. The appellant sexually abused R.E. over a span of several years. R.E. was not comfortable reporting the abuse until after she and her mother no longer lived with the appellant. Moreover, R.E. had problems in school because of the abuse, although she was showing improvement at the time of the sentencing hearing. R.E. testified at the sentencing hearing that she had difficulty trusting people and that she could not tolerate people coming behind her and touching her because it reminded her of the abuse. R.E. said that she still had episodes of crying and shaking and had nightmares, but she was improving with the help of therapy. Given the foregoing facts, we are loath to describe this case as "only 'fondling,' at worst."

Additionally, the appellant's "double counting" argument is unavailing. The 1989 Sentencing Act does not prohibit using the same facts and circumstances to enhance sentences and to impose consecutive sentencing. State v. Elam, 7 S.W.3d 103, 108 (Tenn. Crim. App. 1999); State v. Meeks, 867 S.W.2d 361, 377 (Tenn. Crim. App. 1993). Therefore, we conclude that the trial court did not err in imposing consecutive sentences.

### III. Conclusion

We affirm the appellant's drug related convictions.  However, based upon the trial court's improper special instruction, we reverse the convictions for aggravated sexual battery and attempted aggravated sexual battery and remand for a new trial on those charges.

_____
NORMA McGEE OGLE, JUDGE